
SEALED

COREY R. AMUNDSON, Chief
JORDAN DICKSON, Trial Attorney (CA Bar No. 324406)
ALEXANDER GOTTFRIED, Trial Attorney (NY Bar No. 5490024)
Attorneys for the United States of America
U.S. Department of Justice, Criminal Division
Public Integrity Section
1301 New York Ave. NW
Washington, D.C. 20530
Telephone: 202-597-0508
Jordan.Dickson@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | FELONY COMPLAINT |
| Plaintiff, | Case No. 2:24mj1167-DBP |
| vs. | <u>VIOLATIONS</u>: |
| DAVID COLE, | COUNT I:   21 U.S.C. § 846, Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance |
| Defendant. | |

Before the Honorable Dustin B. Pead, United States Magistrate Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

### **COUNT I**
21 U.S.C. § 846
(Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance)

Between in or about April 2024 and in or about December 2024, in the District of Utah,

**DAVID COLE**,

defendant herein, knowingly and intentionally combined and conspired with PERSON A, and

others, to commit the following offense against the United States: to distribute and possess with

intent to distribute alpha-pyrrolidinohexanophenone (a/k/a Alpha-PHP or "bath salts"), a Schedule

1

I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

## ELEMENTS OF OFFENSE

The elements of Count I are as follows:

1.      Two or more persons agreed to violate the federal drug laws;

2.      The defendant knew the essential objective of the conspiracy;

3.      The defendant knowingly and voluntarily involved himself in the conspiracy;

4.      There was interdependence among the members of the conspiracy.

## AFFIDAVIT IN SUPPORT OF FELONY COMPLAINT

I, Tristan Hall, the undersigned affiant states the following is true and correct to the best of my knowledge and belief:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since October 2014. Before becoming a Special Agent, I worked for the FBI in various other capacities, including as an analyst. I have been employed by the FBI since February 2007.   I have experience conducting investigations into public corruption and drug trafficking.   I am currently assigned to the FBI Salt Lake Division, and I am tasked with investigating violations of federal law to include public corruption and drug trafficking. I have personally participated in this investigation from its onset since October 2024, including through physical surveillance, review of video and audio recordings, review of public records, and interviews with, and analyses of reports submitted by, other law enforcement officers.   I am familiar with the details of this

2

investigation. I am also familiar with the appearance, packaging, common usage, and terminology regarding controlled substances through my training, experience, and observation.

2.      The facts in this affidavit come from my personal observations, my training and experience, review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The dates and times listed in this affidavit should be read as "on or about" dates.

## PROBABLE CAUSE

3.      Beginning in or about October 2024, the FBI and the Department of Homeland Security, Office of Inspector General ("DHS OIG") initiated a joint criminal investigation into COLE and PERSON A.   COLE and PERSON A are currently Special Agents of DHS, Homeland Security Investigations ("HSI").   COLE and PERSON A have had their HSI credentials suspended but have not been terminated as HSI employees.

4.      In October 2024, Defense Attorney A contacted the U.S. Attorney's Office for the District of Utah, in Salt Lake City. Defense Attorney A reported that his client ("CS1") had been working as an HSI confidential human source since CS1's release from prison in May 2023. Defense Attorney A reported that COLE and PERSON A had been requiring CS1 to engage in acts that CS1 believed to be unlawful.

5.       CS1 has a long criminal history, including state misdemeanor and/or felony drug charges in 2001, 2002, 2011, and 2019 and federal drug charges in 2022.    CS1's criminal history also includes state fraud/forgery-related charges in 2004, 2008, and 2011, along with possession of firearm charges in 2004 and 2014, as well as probation violations in 2007, 2008, and 2014. CS1

3

was arrested for the sale of illegal narcotics by HSI in or about April 2022. COLE was one of the agents involved in CS1's arrest.    While CS1 was in prison, COLE and other HSI Special Agents recruited CS1 to operate as an HSI confidential source upon his release.

6.      CS1 has cooperated with the FBI for monetary value and out of fear for his personal safety if he continues following COLE's and PERSON A's directives. I consider the information received from CS1 in the joint FBI/DHS OIG investigation to be accurate and reliable. FBI and DHS OIG investigators have also verified information provided by CS1 in this investigation through independent sources, including surveillance, DHS information pertaining to the suspects, the review of electronic communications, and other investigative actions and information. Based on conversations with CS1 and his criminal history, CS1 appears to be knowledgeable in the sale and distribution of controlled substances.

7.      Upon release from prison in May 2023, CS1 began working with COLE, PERSON A, and other HSI Special Agents on what CS1 believed to be legitimate "controlled buys" from suspected drug dealers. Based on my experience as an investigator, familiarity with narcotics investigations, and my experience investigating federal law enforcement officers, CS1's description of the initial directives CS1 was given by HSI appears to be consistent with HSI policy and procedure pertaining to the investigation of drug trafficking.

8.      However, COLE and PERSON A subsequently approached CS1 with the proposition of engaging in an unlawful transaction involving a-Pyrrolidinohexanophenone (a/k/a Alpha PHP, synthetic cathinones, or "bath salts"), a Schedule 1 controlled substance. Specifically, in or about March or April 2024, COLE initiated an arrangement with CS1 in which CS1 was required to pay COLE or PERSON A $5,000 in exchange for approximately twenty-five

4

grams of bath salt drugs that COLE and PERSON A would then permit CS1 to sell on the street without that sale being part of an HSI operation.[1] According to CS1, COLE and PERSON A instructed CS1 to sell the bath salts to contacts CS1 had in the community, with an understanding that the bath salt product could be resold for approximately $10,000. COLE and PERSON A permitted CS1 to keep the $10,000 when he had completed the sale.

9. According to CS1, after CS1, COLE, and PERSON A began engaging in the above-described transactions, CS1 also continued to participate in what appeared to be legitimate source work by conducting controlled buys. According to CS1, there were additional HSI agents involved in CS1's initial recruitment and CS1's ongoing handling. CS1 engaged in legitimate, successful drug buys involving individuals who were illegally purchasing drugs. CS1's work with the other HSI agents appears to be legitimate.

10. According to CS1, from in or about April 2024 to present, CS1, COLE, and PERSON A have been conducting these unlawful drug deals once or twice a week within the District of Utah, usually arranging the time and place of the meet via an encrypted messaging application called Signal. According to CS1, COLE and PERSON A never arrested any of the individuals to whom CS1 sold the bath salts, nor did COLE and PERSON A provide CS1 with recording devices or other equipment to aid in gathering evidence of those involved in the illegal drug purchases. According to CS1, COLE and PERSON A have a general idea of who CS1's buyers are, but neither COLE nor PERSON A appear to track the amounts of drugs being sold by

---

[1] According to CS1, COLE and PERSON A came into possession of these drugs by taking them from seized evidence from an HSI investigation. The FBI is still in the process of corroborating this allegation, but according to DHS information, PERSON A appears to have evidence custodian duties at HSI.

CS1, the specific sales CS1 makes, nor the specific buyers involved in each transaction. Based on the records I have reviewed thus far, the source's file maintained by HSI does not appear to include documentation of CS1's customers or documentation of any of the meetings that occurred during the controlled buys planned by FBI.

11.     According to CS1, all communications with COLE and/or PERSON A are solely through Signal. I have seen photographs of Signal messages taken by CS1 with COLE and Person A which document the existence and content of these communications.   Signal employs end-to-end encryption and allows users to make voice calls and send texts, voice messages, photos, videos, and other files.   The end-to-end encryption offered by Signal essentially offers customers complete privacy from anyone, including the developers of the Signal application, from being able to obtain any of the data transmitted via Signal.   The data itself is not stored on any Signal servers but rather is only stored on the senders'/recipients' electronic devices.   Users have the option of deleting messages from their devices, in which case, the data no longer exists anywhere.   Users have the option of making their cell phone number visible to other users.   According to CS1, COLE and PERSON A have not made the cell phone numbers associated with their Signal accounts visible to other users.

### Controlled Buys with COLE and PERSON A

12.     After CS1 met with the FBI on October 29, 2024, to report the above-described scheme, the FBI began an operation to corroborate CS1's allegations.   As of the date of this submission, FBI agents and CS1 have conducted eight "controlled buys"—three with PERSON A and five with COLE.   As explained more below, the evidence suggests that PERSON A and COLE have conspired and worked together to execute this scheme, regardless of which one of them actually appears at the buy location to meet CS1.

6

13.     On or about October 30, 2024, PERSON A contacted CS1 via Signal and provided CS1 with an approximate time and place to meet to conduct an exchange.

14.     Prior to the meeting, CS1 met with FBI agents and was given an audio/video recording device to utilize during the meeting. CS1 utilized personal funds to be reimbursed at a later date by FBI agents. FBI agents followed CS1 to the meeting location but were unable to conduct constant surveillance for the duration of the meet.

15.     According to CS1, PERSON A arrived in a black or dark charcoal Nissan Titan, a description consistent with the color, make, and model of PERSON A's government-issued vehicle.

16.     At the meeting, PERSON A sold CS1 what FBI agents believed to be bath salts for $5,000.   According to CS1, PERSON A pointed toward a Styrofoam cup in the center console area.   CS1 handed $5,000 to PERSON A, who removed rubber bands from the money and put the rubber bands inside the Styrofoam cup.   CS1 retrieved the cup.   According to CS1, CS1 and PERSON A had a short conversation regarding narcotics pricing and then CS1 and PERSON A departed the deal location.     Due to the quality of the actual recording from this meeting, it is difficult to determine if/when the conversation regarding narcotics pricing took place.   Agents later observed that the Styrofoam cup contained a sealed plastic bag of the suspected bath salts.

17.     After the deal, FBI agents met with CS1 at a pre-determined location where CS1 relinquished control of the suspected drug evidence. CS1 confirmed that it was in fact PERSON A who had conducted the exchange.

18.     FBI agents transported the suspected narcotics to the FBI Salt Lake City Field Office where it was found to weigh approximately 27.3 grams and booked it into evidence storage.

On November 8, 2024, the FBI conducted a field test for composition of the suspected narcotics using a TruNarc handheld narcotics analyzer.   The field test revealed that the substance tested presumptively positive for being "alpha-PVP (cathinone)," a substance commonly referred to as "bath salts."   The drug evidence was re-booked into evidence storage at the FBI.

19.     On or about November 20, 2024, the FBI Laboratory in Quantico, Virginia tested the substance delivered by PERSON A to CS1 on October 30, 2024.   The examination revealed that the substance contained alpha-pyrrolidinohexanophenone, a Schedule I controlled substance.

20.     On or about November 4, 2024, COLE and CS1 arranged another controlled purchase for November 6, 2024. COLE communicated via Signal. COLE provided CS1 with an approximate location to meet to conduct the exchange.

21.     Prior to the meeting, FBI agents met with CS1 and provided CS1 the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none being found. FBI agents set up surveillance in the vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

22.     COLE was identified by surveillance in his government-issued vehicle, in the parking lot in the vicinity of the deal location. On the way to the meeting location, COLE contacted CS1 via Signal.   COLE advised he was near a restaurant called Shake Shack.   CS1 arrived at the deal location and parked nearby COLE's vehicle.   CS1 got into the front passenger seat of COLE's vehicle. COLE and CS1 engaged in conversation.   According to CS1, during the conversation, CS1 handed $5,000 to COLE, and COLE placed the money in the center console compartment.   Based on a review of the audio/video recordings obtained during the exchange, at

8

some point during the conversation, CS1 moved in a manner where it appeared CS1 was retrieving

something from a pocket.    COLE was then seen closing the center console compartment.

23.    CS1 and COLE continued to engage in conversation, including what seemed to be

about plans for COLE to obtain additional drug product for CS1 to sell.    From prior reporting

from CS1, investigators were aware the supply of bath salts COLE and PERSON A were using

was running low, and that COLE and PERSON A were in the process of trying to identify

additional supply options.    As captured on the audio recording, CS1 asked, "what's the plan on,

how many weeks we got left?"[2]    COLE responded, "I think we're good . . . when I was on the

road with Secret Service and I had free time . . . I'm a decently smart guy so I got some stuff going

to where I, we're . . . locating stuff that's like, outside our area."    In the video recording, COLE

appeared to start typing something into a cell phone.    CS1 asked, "can we go fast or no?" COLE

responded, "It's up to you . . . we could do . . . twice a week . . . I was just worried about you

getting your name heated up a lot...that was my main concern."    CS1 then seemed to advise

COLE that CS1 was trying a different "route" regarding who CS1 was selling to because CS1's

name was "out there" too much.    COLE then appeared to make a suggestion about using only

Signal or WhatsApp and creating a "Text Now" number for people who might cause CS1

problems.    COLE made no effort to try to identify CS1's new buyers.    COLE was seen on the

video recording holding his cell phone out so CS1 could see the screen and COLE instructed CS1

to "read that" and made reference to a seizure and said, "in the report, they listed it as that."    CS1

told investigators COLE was concerned about the quality of the drug product.    In the recording,

---

[2] Quotations throughout this affidavit are rough transcriptions and may not reflect perfectly
verbatim transcriptions.

9

COLE can be heard saying "I'm thinking what we do is like, kick you a bag . . . and you just drop it . . . then see what people tell you . . . like for free...so you don't cause yourself, like, any sort of . . . blow back." CS1 told investigators that COLE advised he was going to provide a small amount of product for free for CS1 to allow a customer to try to see how good the quality was. Based on my training and experience, I believe that when COLE referenced that CS1 could "just drop it . . . like for free," COLE was conveying that CS1 could allow his buyers to sample the drug product free of charge as a way to test whether the product was of sufficient quality for CS1 to sell at the same price.

24.     COLE then said, "I did some scouring . . . so I think . . . as of right now, not counting what I just showed you . . . we're sitting on . . ." COLE then showed his phone to CS1 again and said, "like, around there." COLE then appeared to talk about the possibility of diluting the current supply they were using in order to "extend" the amount of product. At the end of the conversation, CS1 appeared to be looking for something. COLE said, "Oh," and appeared to make a physical gesture toward the floor of the vehicle. CS1 said, "oh, right there," and then retrieved an item from the floor. COLE said, "handle it," and CS1 got out of COLE's vehicle. Shortly thereafter, CS1 and COLE departed the deal location.

25.     Surveillance followed COLE from the buy location to a flooring store. Surveillance observed COLE enter and exit the flooring store. COLE subsequently returned to his residence.

26.     FBI agents had previously obtained consent to track the physical location of a cell phone used by CS1. FBI agents tracked CS1's location, as well as followed CS1, back to a pre-determined location where FBI agents met with CS1. CS1 relinquished possession of the

audio/video recording/transmitting devices and the suspected drug evidence. CS1's person and vehicle were subsequently searched for additional amounts of contraband and for currency with none being located. CS1 confirmed it was COLE who had conducted the exchange.

27.     The suspected narcotics evidence was transported to FBI where it was found to weigh approximately 27.2 grams. The suspected narcotics were booked into evidence for storage. On November 8, 2024, the FBI conducted a field test for composition of the suspected narcotics using a TruNarc handheld narcotics analyzer.   The field test revealed that the substance tested presumptively positive for being "alpha-PVP (cathinone)," a substance commonly referred to as "bath salts."   The drug evidence was re-booked into evidence storage at FBI.

28.     On or about November 9, 2024, COLE contacted CS1 via Signal to coordinate an additional transaction to take place on November 11, 2024.   Prior to the meeting, agents met with CS1 and provided them the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none being found. FBI agents set up surveillance in vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

29.     On November 11, 2024, COLE was identified by surveillance in his government vehicle in the parking lot in the vicinity of the deal location.   CS1 met with COLE and exchanged $5,000 for an additional approximate twenty-five grams of suspected illegal drugs ("Sample A"). In addition, COLE provided CS1 with approximately 10 grams of an additional suspected drug product ("Sample B").   According to CS1, COLE advised that COLE was not able to determine the drug type of Sample B when he tested it with a machine.   CS1 was supposed to have a customer try Sample B to test out its quality.

11

30.     I reviewed the audio/video recordings obtained during the transaction.     When CS1 opened the passenger door of COLE's vehicle to get in, what appears to be a plastic bag, red in color, can be seen on the floor of the front passenger seat area.     CS1 engaged in idle conversation. After pleasantries were exchanged, COLE said, "couple things, one . . .," and pointed toward the floor, presumably to the red plastic bag, "you're good there."     COLE then continued, "but then there's the other stuff.   I have no clue.   If it's shit, it's shit. . .you're gonna have to let your homegirls, or whatever, uh, give it a go. . .and if it has value, then it has value."     Based on my training and experience, I believe COLE was requesting CS1 provide the new sample product to a customer to find out the quality of the new sample.     CS1 asked, "it's already in there?", presumably referring to the red bag, and COLE confirmed and said, "like ten."     CS1 said, "even if it's crap, she'll be happy."     COLE continued, "even if it's crap, then you, being the business smart man that you are, figure out, like, what's a reasonable way to get rid of it, because we got, like, a key."     Based on my training and experience, I know that references to a "key" likely means a kilogram of the product.     Based on my training and experience, I believe COLE is requesting CS1 determine a reasonable price in order to sell the new product.     COLE then explained the way the product was tested with a "machine" and how the machine's catalog needs to be updated and if it is not updated, it will only provide "basic" information.     COLE then said, "this one just says cathinone."     In my training and experience, I know that cathinone refers to bath salts.     COLE continued and said "you figure that out.   If you come back and say, hey, man, I think we can do like 80, uh, per – then that's what we'll do. . .because we just pulled it out of curiosity – it wasn't even coming here."     COLE then said, "we've got an overabundance of that. . .and then we have, a decent amount, like I told you, probably like around, like I told you 250."     Based on my training

12

and experience, I believe COLE is indicating he obtained the new product from a law enforcement seizure that took place in a different geographical area than where COLE is assigned to work. I believe COLE is further indicating the amounts of the different samples available. COLE then explained that at the end of the year, it's a slow time for "Customs" (presumably U.S. Customs and Border Protection) because they take time off. COLE can then be seen opening the center console compartment. CS1 placed what appeared to be a large wad of cash wrapped in rubber bands inside the center console. COLE then can be seen shutting the console.

31. COLE and CS1 then started talking about an individual who is involved in cooking bath salts. COLE said, "here's what I'll do . . . info came from you and then I'll say some other sources independently went and checked and it was, like, verifiable and then we'll get probation, we'll go, we'll check, and then what we'll do is, if there's anything good, we'll just stop, write a quick search warrant . . . that way that can be on your tab for when the money opens back up." According to CS1, it appeared COLE planned to falsely claim CS1 provided information in order to get a search warrant and further indicated an intention to pay CS1 once more funding became available. Based on my training and experience, I agree with CS1's assessment. At the end of the meeting, CS1 appeared to move in a manner to retrieve something from the floor of the vehicle, and then a red plastic bag can be seen in CS1's hand. COLE then instructed CS1 to "stay low." CS1 and COLE had a brief conversation about CS1 using a different name and COLE watching out to see if the different name is mentioned in reporting obtained by COLE.

32. FBI surveillance followed CS1 back to a pre-determined meet location, without any unplanned stops. CS1 relinquished possession of the audio/video recording/transmitting devices and the suspected drug evidence. The suspected drug evidence was contained within the red bag

13

observed on the video recordings.   CS1's person and vehicle were subsequently searched for additional amounts of contraband and currency with none being located. CS1 confirmed it was COLE who had conducted the exchange.

33.     The suspected narcotics evidence was transported to FBI.   Sample A was found to weigh approximately 27.2 grams.   The suspected narcotics evidence was tested using a TruNarc handheld narcotics analyzer and tested presumptively positive for being alpha-PVP Cathinone (commonly known as bath salts).   The drug evidence was booked into evidence storage at FBI.   Sample B was tested using a TruNarc handheld narcotics analyzer and tested "inconclusive."

34.     On November 13, 2024, CS1 and COLE communicated via Signal to arrange for another drug buy to take place on November 14, 2024.   As reflected in photographs CS1 took of the Signal communications, COLE inquired as to the quality of the Sample B product he had previously provided to CS1.   CS1 told COLE the product was "ok," and CS1 believed he could sell it for $200 per gram.   COLE asked how much of the Sample B product CS1 wanted, and CS1 requested 25 grams, just like Sample A.

35.     On the day of the arranged drug transaction, November 14, 2024, FBI surveillance observed PERSON A leave his personal residence in his personal vehicle and drive to COLE's residence.   PERSON A was seen carrying a dark-colored bag, similar to the style of a gift bag, into COLE's residence.   FBI surveillance confirmed COLE was home at the time.   At some point later, PERSON A left and returned to his residence.   COLE was then observed departing his residence in his government-issued vehicle and traveling to the previously agreed upon area to

14

meet with CS1. COLE went into Panera Bread, and CS1 received a message via Signal advising of COLE's location inside Panera Bread.

36.     Prior to the meeting between COLE and CS1, agents met with CS1 and provided them the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none being found. FBI agents set up surveillance in vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

37.     On November 14, 2024, CS1 met with COLE at Panera Bread and exchanged $5,000 for an additional approximate twenty-five grams of suspected illegal drugs from Sample A. COLE also provided approximately 25 grams of the Sample B product. COLE and CS1 engaged in brief conversation and, according to CS1, COLE advised he had given approximately three grams of Sample B to another confidential source ("CS") for testing.

38.     I have reviewed the audio/video recordings obtained during the operation. After going inside the Panera Bread restaurant, CS1 and COLE engaged in idle conversation. COLE then said, "I brought this for you, dude." COLE handed a dark colored bag across the table to CS1. According to CS1, CS1 passed a bundle of cash to COLE over the table. The audio/video recording devices did not capture the passage of money to COLE.

39.     Investigators obtained CCTV footage from Panera Bread covering the time period of the November 14, 2024 meeting between COLE and CS1. In the CCTV footage, COLE is seen handing a dark-colored bag over the table to CS1. Based on two different angles of footage, CS1 was seen handing the bundle of cash across the table to COLE. COLE was seen taking the cash and putting it in his pocket.

40.     COLE went on to tell CS1 about a meeting with another individual COLE identified by name.   Based on the investigation to-date, I believe this individual is a Source of Information for HSI, but not a formally signed up CS.   COLE said, "when I…talked to him…I gave him three and then…hey dude, just see what you think…because…like I told you, the regular branded, whatever you wanna call it…PVP…whatever…it's very, very little anywhere in the country, right?"   Based on my training and experience, I believe COLE was advising CS1 that COLE provided three grams of Sample B to this other individual to try out.   I believe COLE was then talking about the scarcity of bath salt product.

41.     COLE went on to talk about a subject in Moab, Utah involved in use and/or distribution of bath salts.   COLE told CS1 that COLE wanted to gather information about the source and cost of the bath salts.   COLE then said, "the machine in L.A. said it was PVP…and our machine said it was as well…it looks little different…so maybe that would be something of interest, I don't know…otherwise, if that other stuff works, there was different variants of that floating around…so we'll play that by ear…because that seems plentiful."   Based on my training and experience, I believe COLE was talking about potential sources of bath salt supply to sell in the future.

42.     COLE and CS1 went on to discuss potential websites involved in selling bath salts. COLE then appeared to suggest to CS1 that COLE and CS1 work together to create a website, "use a good VPN," and "send out welcome emails" using an email list COLE obtained from a "downloaded server."   Based on my training and experience and the context of the conversation, I believe COLE may have been making reference to email data obtained through HSI of individuals

16

who had purchased bath salts via online websites. COLE appeared to be suggesting COLE and CS1 sell bath salts online.

43.     At the conclusion of the meeting, FBI surveillance followed CS1 back to a pre-determined meet location, without any unplanned stops. CS1 relinquished possession of the audio/video recording/transmitting devices and the suspected drug evidence. The suspected drug evidence was contained within a dark-colored bag, similar to a gift bag style, consistent with the bag PERSON A had been seen carrying into COLE's residence that morning. Based on a comparison of the dark-colored bag retrieved from CS1 and the video footage obtained during CS1's meeting with COLE, the bags appear to match. Both Sample A and Sample B were packaged in the same way. Along with the suspected drug evidence, the bag contained two black gloves that appeared to have been worn and two clothing items. CS1's person and vehicle were subsequently searched for additional amounts of contraband and currency with none being located. CS1 confirmed it was COLE who had conducted the exchange. Based on the above, investigators believe the dark-colored bag that was provided to CS1 by COLE is the same bag PERSON A transported to COLE's residence. Based on the investigation, investigators believe PERSON A was likely involved in packaging the samples based on CS1's request for 25 grams of each.

44.     The suspected narcotics evidence was transported to FBI. Sample A was found to weigh approximately 26.8 grams. Sample B was found to weigh approximately 28.8 grams. Both samples of the suspected narcotics evidence were tested using a TruNarc handheld narcotics analyzer. Sample A tested presumptively positive for being alpha-PVP Cathinone (commonly known as bath salts). Sample B tested "inconclusive." The drug evidence was booked into evidence storage at FBI.

17

45.     On November 17, 2024, CS1 and PERSON A communicated via Signal to arrange for another drug buy to take place on November 18, 2024.   CS1 was directed to meet PERSON A at 10:00am at a Smith's grocery store in Herriman, Utah.

46.     Prior to the meeting between PERSON A and CS1, agents met with CS1 and provided them the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none being found. FBI agents set up surveillance in vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

47.     On the day of the arranged drug transaction, November 18, 2024, FBI surveillance observed PERSON A leave his personal residence in his government issued vehicle.   FBI surveillance lost visual of PERSON A at some point along the route to the meeting location, but FBI surveillance did ultimately observe PERSON A in the parking lot of the pre-arranged meet location and observed PERSON A meeting with CS1.

48.     CS1 exchanged $7,500 for an additional approximate twenty-five grams of suspected illegal drugs from Sample A and twenty-five grams of suspected illegal drugs from Sample B.

49.     I reviewed the consensual audio/video recordings obtained during the operation. CS1 got into PERSON A's government issued vehicle and engaged in idle conversation with PERSON A.   PERSON A then said "well, uhm…" and physically gestured toward the back seat of his vehicle.   CS1 appeared to look at what PERSON A was gesturing toward and retrieved a bundle of cash from CS1's pocket.   CS1 placed the bundle of cash on the center console and said, "right here?"   PERSON A picked up the bundle of cash and moved it to the area of the driver's

18

side door.   CS1 retrieved a brown paper bag from the back seat.   PERSON A then said, "the new?"   CS1 responded "it's all right…I'm doing, you know, here's the premium stuff…if you want the lesser stuff, you can pay this…and they're taking it, so fuck it."   PERSON A said, "right?"   CS1 continued, "if we run out of the other stuff…this might take a little longer." PERSON A responded "awesome, dude."   Based on my training, experience, and contextual knowledge regarding the captioned investigation, I believe when PERSON A made reference to "the new," he was referring to the Sample B product discussed previously within this affidavit. CS1 and PERSON A engaged in additional idle conversation before CS1 exited PERSON A's vehicle.

50.    At the conclusion of the meeting, FBI surveillance followed CS1 back to a pre-determined meet location, without any unplanned stops.   CS1 relinquished possession of the audio/video recording/transmitting devices and the suspected drug evidence. The suspected drug evidence was contained within a brown paper McDonald's bag.

51.    The suspected narcotics evidence was transported to FBI.   Sample A was found to weigh approximately 27.1 grams.   Sample B was found to weigh approximately 28 grams. Both samples of the suspected narcotics evidence were tested using a TruNarc handheld narcotics analyzer.   Sample A tested presumptively positive for being alpha-PVP Cathinone (commonly known as bath salts).   Sample B tested "inconclusive."   The drug evidence was booked into evidence storage at FBI.

52.    On November 20, 2024, CS1 and PERSON A communicated via Signal to arrange for another drug buy to take place on November 21, 2024.   CS1 was directed to meet PERSON A at 10:00am at the Nike Store in the area of Mountain View Village in Riverton, Utah.

19

53.    Prior to the meeting between PERSON A and CS1, agents met with CS1 and provided them the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none being found. FBI agents set up surveillance in vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

54.    On the day of the arranged drug transaction, November 21, 2024, FBI surveillance observed PERSON A leave his personal residence in his government issued vehicle.    PERSON A drove to the area of the pre-arranged meeting.    PERSON A was observed by FBI surveillance engaging in what appeared to be counter-surveillance maneuvers.    PERSON A parked in the vicinity of a trash can, exited his vehicle and placed something in the trash can.    PERSON A then returned to his vehicle and proceeded to drive to the vicinity of the Nike Store.    PERSON A parked near CS1's vehicle.

55.    I reviewed the consensual recordings obtained during the operation.    When CS1 got out of CS1's vehicle, CS1 appeared to go on a walk with PERSON A.    After engaging in personal conversation, PERSON A asked CS1 about "the new…it's good?"    CS1 advised that it was and informed PERSON A that CS1 was providing a discount on the new, so "people love it…it goes almost just as fast."    PERSON A responded, "that's good, man."    Based on my training, experience, and contextual knowledge pertaining to the captioned investigation, I believe when PERSON A made reference to "the new" he was referring to the Sample B product previously mentioned in this affidavit.    Later in the conversation, PERSON A said, "the original…not really running into it…I have to check…we have a little bit."    Based on my training, experience, and my contextual knowledge pertaining to the captioned investigation, I

believe when PERSON A made reference to "the original," he was referring to the Sample A product previously mentioned in this affidavit. PERSON A then said, "so I put it in a trash can…in a Chick-Fil-A Styrofoam cup…one black glove has like three little baggies in there…that's the real, the original…the other one's the big old rocky shit." CS1 asked if it's "the trash can by the Nike Store?" PERSON A responded, "No, I'll show you…like in the middle of the parking lot, kind of…by that tree with the orange leaves…I don't think there's anything else in there." PERSON A and CS1 continued to engage in general conversation. PERSON A later pointed out "yeah, so it's under that…orange leaves…but, I would go say go grab a drink somewhere…and drive around." PERSON A then made reference to vehicles in the parking lot. CS1 said, "you want this now? Or you want me to jump in the truck." PERSON A said, "jump in the truck." CS1 then appeared to get into PERSON A's government issued vehicle. PERSON A and CS1 appeared to engage further in a conversation about an individual who was involved in refining orange bath salts to become white in color. PERSON A then told CS1 about an individual in Moab, Utah involved in bath salts "coming from the U.K." Although a money exchange was not captured on the video recordings obtained during the operation, CS1 told investigators that during the meeting in PERSON A's vehicle, PERSON A opened the center console for CS1 to place the money inside. During the recording, a noise can be heard that appears to sound like a center console being opened and closed. According to CS1, CS1 placed the $7,500 cash previously provided by the FBI into the center console. CS1 eventually got out of PERSON A's vehicle and returned to CS1's vehicle. CS1 appeared to drive briefly and then based on the surroundings seen on the video recording, appeared to retrieve something from a trash

21

can. FBI surveillance observed CS1 retrieve an item from the trash can and return to CS1's vehicle.

56. At the conclusion of the meeting, FBI surveillance followed CS1 back to a pre-determined meet location, without any unplanned stops. CS1 relinquished possession of the audio/video recording/transmitting devices and the suspected drug evidence. The suspected drug evidence was contained within a Chick-Fil-A Styrofoam cup, along with black gloves, and four baggies, as described by PERSON A. There were three baggies that appeared to contain a finer granular substance and one baggie with a "chunky" substance.

57. The suspected narcotics evidence was transported to FBI. Sample A, including three baggies, was found to weigh approximately 30 grams. Sample B was found to weigh approximately 27.6 grams. Both samples of the suspected narcotics evidence were tested using a TruNarc handheld narcotics analyzer. Sample A tested presumptively positive for being alpha-PVP Cathinone (commonly known as bath salts). Sample B tested "inconclusive." The drug evidence was booked into evidence storage at FBI.

58. On November 24, 2024, according to CS1, CS1 and COLE communicated via Signal to arrange for another drug buy to take place on November 25, 2024, at 10:00am. On the morning of November 25, 2024, CS1 was directed by COLE to meet in the vicinity of Mountain View Village in Riverton, Utah.

59. Prior to the meeting between COLE and CS1, agents met with CS1 and provided them the drug evidence purchase money and multiple audio/video recording/transmitting devices to utilize during the meet. CS1's person and vehicle were searched for any contraband with none

being found. FBI agents set up surveillance in vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

60.     On the day of the arranged drug transaction, November 25, 2024, FBI surveillance observed COLE leave his personal residence in his government-issued vehicle.   FBI surveillance lost visual of COLE at some point along the route to the meeting location, but FBI surveillance did ultimately observe COLE in the parking lot of the meet location at Panera Bread, in Riverton, Utah and observed COLE meeting with CS1.

61.     On November 25, 2024, CS1 met with COLE at Panera Bread and exchanged $7,500 for approximately twenty-five grams of suspected illegal drugs from Sample A and approximately twenty-five grams of suspected illegal drugs from Sample B.

62.     I reviewed the consensual recordings obtained during the operation.   During the meeting inside Panera Bread, CS1 and COLE engaged in idle conversation.   COLE then said, "this dude who works for my good friend out in Kentucky . . . and he knows that like . . . he and I are tight…he hits me up with some . . . and just basically says hey man, I know you guys [unintelligible] . . . you could probably make something happen . . . I said, yeah, man . . ."   COLE appeared to continue on to talk about bath salts and potential sources of supply on the dark web. COLE talked about a type of cathinone called "pentedrone."   COLE then said, "he wants to send it out next week, so I was like, I mean, hey, bro, who am I to argue . . . now you are going to have to do the same shit with it to where you're going to have to do trial and error."   CS1 responded, "okay."   Based on my training, experience, and contextual knowledge in the captioned investigation, I believe COLE was talking about a potential new source of illegal bath salt drug supply from Kentucky.   I believe COLE was telling CS1 that COLE would obtain the product

and CS1 would need to have some customers test the product.   In the recording, COLE made reference to an unknown individual who was sitting in Panera Bread drinking coffee.   When COLE and CS1 left Panera Bread, COLE instructed CS1 to take an "unusual route" when leaving. According to CS1, COLE appeared paranoid about an unknown male in Panera Bread at the time of their meeting.

63.     Investigators have requested the CCTV footage from Panera Bread covering the time period for the November 25, 2024 meeting between COLE and CS1.

64.     At the conclusion of the meeting, FBI surveillance/tracking abilities followed CS1 back to a pre-determined meet location, without any unplanned stops.   CS1 relinquished possession of the audio/video recording/transmitting devices and the suspected drug evidence. The suspected drug evidence was contained within a dark-colored bag, along with a pair of jeans, two black gloves, and two baggies.   One baggie appeared to contain a finer granular substance and one baggie appeared to contain a "chunky" substance.

65.     The suspected narcotics evidence was transported to FBI.   Sample A was found to weigh approximately 27 grams.   Sample B was found to weigh approximately 28.2 grams. Both samples of the suspected narcotics evidence were tested using a TruNarc handheld narcotics analyzer.   Sample A tested presumptively positive for being alpha-PVP Cathinone (commonly known as bath salts).   Sample B tested "inconclusive."   The drug evidence was booked into evidence storage at FBI.

66.     On or about November 30, 2024, COLE contacted CS1 via Signal to coordinate an additional transaction.   COLE and CS1 agreed to meet on December 2, 2024, at a Harmon's in Draper, Utah at approximately 10:00am.   Prior to the meeting, agents met with CS1 and provided

them with $7,500 in drug purchase money and multiple audio/video recording/transmitting devices to utilize during the meet.   CS1's person and vehicle were searched for any contraband with none being found.   FBI agents set up surveillance in the vicinity of the meeting location and followed CS1 to the meeting without making any unplanned stops.

67.     On December 2, 2024, COLE was identified by surveillance in his government vehicle in the parking lot of the vicinity of the deal location.   PERSON A was also identified by FBI surveillance in his government vehicle in the area of the deal location.   Based on PERSON A's movements, it appeared PERSON A was conducting surveillance to support the transaction. CS1 was advised of a dead-drop location to retrieve suspected illegal bath salt drugs.   CS1 provided COLE with the $7,500 for the anticipated approximate 25 grams of suspected illegal bath salt drugs from Sample A and approximate 25 grams of suspected illegal bath salt drugs from Sample B.

68.     At the conclusion of the meeting with COLE, CS1 proceeded to the dead-drop location and retrieved what CS1 believed to be the suspected drugs.   Upon leaving the meeting location, PERSON A was observed to be following CS1.   CS1 was later re-contacted by COLE, and COLE requested CS1 return for an additional meeting at a new location, an outlet mall area in Lehi, Utah.   CS1 agreed to the meeting and subsequently was advised by COLE that CS1 had only retrieved one of two items from the dead-drop location containing the suspected drugs.   CS1 was directed on how to locate the additional item, and CS1 subsequently did.   Investigators are still in the process of reviewing the audio/video recordings from the operation.

69.     At the conclusion of the second meeting, CS1 and agents met at a pre-determined location.   CS1 relinquished possession of the audio/video recording/transmitting devices and the

suspected drug evidence.   CS1's person and vehicle were subsequently searched for additional amounts of contraband and currency with none being located.   CS1 confirmed it was COLE who had conducted the exchange.

70.     The suspected narcotics evidence was transported to FBI and booked into evidence storage.

71.     According to CS1, the previously described scheme wherein COLE and PERSON A have sold suspected illegal drugs to CS1 started in or about April 2024, approximately 30 weeks prior to the captioned investigation being initiated.   Based on an average of one or two drug buys per week, involving 25 grams of bath salts and the amount of $5,000 each buy, it is estimated that COLE and PERSON A have profited approximately $150,000 to $300,000 in illegal proceeds.

72.     All of the above-described controlled buys occurred within the District of Utah.

### *The Executed Search Warrants*

73.     On December 4, 2024 and December 5, 2024, agents executed a series of warrants. Those warrants authorized agents to search COLE and PERSON A, their residences, their government vehicles, their government phones, their HSI cubicles, and a safety deposit box.   The warrants authorized agents to search electronic devices, lock boxes, safes, etc., found within the residences, vehicles, and cubicles or on the person of the subjects.

74.     During the searches, agents seized substances that appeared to be bath salts, more than $67,000 in cash, and other evidence.

### CONCLUSION

75.     I affirm that the information in this affidavit is true and accurate to the best of my knowledge and belief.   I submit that there is probable cause to believe that COLE committed the SUBJECT OFFENSE and request that the Court issue an arrest warrant for COLE.

Dated this 6th day of December, 2024.



_____
Tristan Hall, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO before me this 6th day of December, 2024.

_____
DUSTIN B. PEAD
United States Magistrate Judge

Approved as to form:

COREY R. AMUNDSON
Chief, Public Integrity Section

/s/ Jordan Dickson
JORDAN DICKSON
Trial Attorney